# NO. 12-19-00066-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | *§* | *APPEAL FROM THE 307TH* |
| *J.G.M., D.M., L.G.M. & L.E.M.,* | *§* | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | *§* | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

L.M. appeals the termination of his parental rights. In one issue, he challenges the factual sufficiency to support the finding that termination was in the best interests of the children. We affirm.

## BACKGROUND

A.W.[1] is the mother of J.G.M., D.M., L.G.M., and L.E.M. L.M. is the father of D.M., L.G.M., and L.E.M. J.G.R.M.[2] is the father of J.G.M. On August 7, 2017, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of L.M.'s, A.W.'s, and J.G., R.M.'s parental rights. The Department was appointed temporary managing conservator of the children, and L.M.

---

[1] At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that A.W. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D) (endangering environment), (E) (endangering conduct), (J) (school enrollment and/or child's absence from home), and (O) (compliance with a court order) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between A.W., J.G.M., D.M., L.G.M., and L.E.M. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between A.W., J.G.M., D.M., L.G.M., and L.E.M. be terminated. The mother is not a party to this appeal.

[2] At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that J.G.R.M., the alleged father of J.G.M., has not registered with the paternity registry under Chapter 160 of the Texas Family Code. The trial court also found that termination of the parent-child relationship between J.G.R.M. and J.G.M. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.G.R.M. and J.G.M., if any exists or could exist, be terminated. The father of J.G.M. is not a party to this appeal.

and A.W. were appointed temporary possessory conservators with limited rights, duties, access, and possession.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that L.M. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), (F), (J), and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between L.M., D.M., L.G.M., and L.E.M. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between L.M., D.M., L.G.M., and L.E.M. be terminated. This appeal followed.

### TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2018); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2018); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of

the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## BEST INTEREST OF THE CHILD

In his sole issue, L.M. argues the evidence is factually insufficient to support a finding that termination of his parental rights is in the children's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who

3

have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

## Analysis

This case involves four children, J.G.M., ten years old, D.M., eight years old, L.G.M., six years old, and L.E.M., two years old, at the time of trial. The case began on August 4, 2017 when law enforcement responded to a disturbance call at the American Dream Inn motel ("motel"). According to A.W. and L.M., they were drinking a mixture of whiskey and an energy drink, and smoking marijuana in their vehicle while the children were inside the motel room. A.W. stated that another man began screaming at L.M. and threatening to kill him. She went towards the man and stated that he lunged at her and stabbed her. Law enforcement arrived and arrested A.W. and L.M. for public intoxication. Jerry Ramsey, an officer with the Longview Police Department, testified that he responded to the disturbance call and concentrated on the children involved. He testified that the entire motel room was covered in trash, cigarette butts, and there was a "very, very" strong odor of feces and urine as he opened the door. Ramsey stated that on the night stand and throughout

4

the room, there were half empty bottles of alcohol and whiskey, and a prescription bottle, all clearly accessible to the children.

According to Ramsey, L.E.M., the infant, was inside a Pack 'N Play crib. He picked L.E.M. up and after looking for a bottle, asked J.G.M. for a bottle. J.G.M. gave Ramsey a plastic bottle and he discovered the beginnings of mold on the lid. He also looked around for clothing to dress L.E.M. He found a "onesie" but it was soaked in urine. Ramsey ended up wrapping L.E.M. in the one blanket that did not have mice feces in it and did not smell "that bad." He stated that rat or mice feces was in the Pack 'N Play. The children mentioned that there was a rat or mouse in the room, that they played with it, and had named it. He observed a rat or mouse run underneath one of the beds.

Ramsey discovered a large pile of used feminine hygiene products, tampons and pads, in the bathroom. He was concerned with the children's safety because there was blood on the feminine hygiene products, and it was very unsanitary. There was also mold on the bathtub. Ramsey took the children to the Longview Police Department. The children smelled strongly of body odor and urine, and officers coming in the front lobby noticed the smell as they walked in. All the children were dirty as if they had not had a bath all day and their clothes were dirty.

Nikki Cassin, an officer with the Longview Police Department, testified that she was called to assist Ramsey with the children at the police department. She observed that L.E.M. was dirty and the children smelled as if they had not bathed in several days. L.E.M. was awake and "very filthy." Cassin took some baby wipes and cleaned the baby's face, neck, feet, hands, and body. She also changed the baby's diaper because it was saturated. She observed some white substance on the baby's labia and used a baby wipe to clean around her vaginal opening. Cassin stated that this could have been from an infection, abuse, or not having a bath for a very long time. She believed that L.E.M.'s condition was not that of a normal child. She was "significantly" concerned at the time.

According to Brie'Unna Ivory, an investigator with the Department, both parents were intoxicated when she met them after their arrest. She visited them in the Gregg County jail and both parents admitted to drinking whiskey mixed with an energy drink. L.M. admitted that they were smoking marijuana and checking on the children. Ivory was concerned that the children were in a motel room without supervision and that the parents were outside, intoxicated to the point that they were arrested for public intoxication. The children were removed and placed in foster care.

5

*Criminal History.* On July 7, 2014, L.M. was convicted of assault—family violence, a class A misdemeanor, against A.W. and was sentenced to one year in county jail. The indictment also included an enhancement paragraph that L.M. was previously convicted of an offense against a member of his family, member of his household, or a person with whom he had a dating relationship in 2013. L.M. was convicted of assault causing bodily injury—family violence, a class A misdemeanor, against A.W. on April 17, 2016, and was sentenced to 250 days in the county jail. L.M. was also convicted of assault causing bodily injury—family violence, a class A misdemeanor, against A.W. on May 7, 2016, and was sentenced to 250 days in the county jail. L.M. was convicted of criminal trespass on September 15, 2017, by intentionally or knowingly entering the property of another without the effective consent of the owner. He was sentenced to fifteen days in the county jail. L.M. also admitted that he had twice been convicted of driving while intoxicated. A.W. described their prior relationship as "violent" and L.M. described it as "volatile."

*Prior Department Case.* In a prior Department case, there were allegations that L.G.M. cried for "Daddy [to] get off Mommy." The investigator found drug paraphernalia in their living space. A.W., L.M., J.G.M., D.M., and L.G.M. tested positive for methamphetamines. The children were removed and after completing services, including parenting classes and obtaining stable housing, the children were returned to the parents. The parents signed a mediated settlement agreement. However, shortly thereafter, A.W. discontinued her mental health medications, halved J.G.M.'s medications, and both parents began drinking, smoking marijuana, and panhandling, all in violation of their mediated settlement agreement. Further, their housing situation deteriorated when they were evicted from their home shortly after the case ended.

*Desires of the Child.* According to the CASA volunteer, J.G.M. does not want to return to live with his mother or stepfather, stating that it was best for him. He loves them and stated that his father was L.M. He described situations regarding drug use, violence, and alcohol. J.G.M., D.M., and L.G.M. describe panhandling with L.M. According to the children, they usually threw away food given to them because, as L.M. explained, other people would not give them money if they had food. According to J.G.M., L.M. would tell them to not wear shoes and walk away from their vehicle to make them appear as if they did not have shoes or a vehicle. Regarding L.E.M., the court found that she was too young to give an indication of her desires and there was evidence that she has become bonded to her foster care placement and is doing well.

*Emotional and Physical Needs of the Children.* J.G.M. and L.G.M. are placed separately from D.M. and L.E.M. Initially, J.G.M.'s behavior problems caused him to be in a "specialized" foster home and the other foster home only accepted "basic" children. However, L.G.M.'s level of care increased, and she was placed with J.G.M.

According to Kemyisha Daniels Scott, a conservatorship worker with the Department, J.G.M.'s behaviors changed over the course of the case. At first, he was very, very nervous, erratic, and was not used to being told "no." If J.G.M. was not allowed to do something, he threw fits, broke his glasses, and damaged property. Now, J.G.M. is able to adjust his behavior and sometimes needs "alone time" in his bedroom. He has learned structure and techniques to de-escalate. Scott does not believe that his home life, if returned, would have that same stability or structure. Nor, based on prior instances, does she believe that J.G.M.'s medication would be maintained.

L.G.M. has some behavioral issues. She was not accustomed to being told "no." Her teacher said that if she does not want to do something, she "flat out" will not do it. She is in counseling and on medication. Scott is afraid that the children will relapse if returned to their parents. J.G.M. will not be medicated nor will he and L.G.M. have the structure that they are used to. Scott believes there will be issues in the home based on the history of the family and that the behaviors and circumstances would add to the likelihood of relapse. According to A.W., all the children are behind in school. The court found the evidence "overwhelming" that the children had extreme emotional needs in the past and will continue to have emotional needs in the future.

*Emotional and Physical Danger to the Children.* The parents admitted to violence in their relationship in the past. A.W. and L.M. stated that A.W. is on medication for her mental health issues and that they no longer argue. However, they do not have stable housing, having rented a mobile home only the month before trial. Nor did they provide receipts of their business before trial. According to A.W. and L.M., their cleaning business makes about $2,000.00 per month. However, as of September 2017, the business only deposited $165.26. According to L.M., their clients pay cash or by credit card.

Nonetheless, L.M.'s substance abuse counselor testified that he had a positive attitude about working his services. Both parents were eligible for discharge and neither tested positive for drugs during the case. However, Scott stated that L.M. did not follow the recommendations of

the psychiatrist who advised medication for L.M.'s diagnosis of bipolar disorder. L.M. refused medications, and Scott stated that such refusal was a violation of the service plan.

In its oral ruling, the court found that there was, "without question," emotional and physical danger to the children by the parents including domestic violence in small confined spaces such as hotel rooms that placed the children in physical danger. The evidence also showed that the children may have witnessed sexual activity between the parents on some occasions that was emotionally damaging to them. L.M. denied any sexual allegations against L.G.M. and denied that the children watched he and A.W. have sexual relations. He blamed a movie that the children watched that contained strong sexual content. He stated that the allegation for "Daddy [to] get off Mommy" purportedly made by L.G.M. was made before she was able to speak.

*Parental Abilities.* Both parents stated that they looked after the children while intoxicated. A.W. admitted that when she and L.M. wanted to have sex, they locked the children out of the motel room. She said that L.E.M. stayed in the room, but no one supervised the children. A.W. noted that J.G.M. had a positive drug screen for cocaine and that it must have occurred during one of the times that he was locked out. The CASA volunteer stated that J.G.M. missed being able to be away from the motel room for most of the day, being old enough at eight years old to not have to stay in the motel room. The volunteer was concerned that he was completely unsupervised. The parents acknowledged that the motel room was dangerous to the children and not a safe environment.

In its oral ruling, the court found that there was very little evidence that L.M. has been able to reflect any real parenting ability in the past that would be in the best interest of the children. The court found that the parents have been unable to support themselves financially, unable to provide stability, and have engaged in conduct harmful to the children in front of them, with the use of drugs, domestic violence, and potentially sexual activity.

*Programs Available.* The evidence shows that A.W. has been to the Andrews Center and received medication for her mental health issues. L.M. and the children have also been in counseling and the children are receiving appropriate medications. However, in the prior case, A.W. stopped both her medications and J.G.M.'s medications. No other programs were mentioned as helping the parents in the future.

8

*Plans for Children.* L.M.'s goals for the children include enrolling them in school, having them receive counseling, and giving them the attention that they need. The Department's goals include termination of the parental rights and adoption.

*Stability of the Home.* At the time of trial, the parents were living in a mobile home that they had for approximately one to two months. The evidence showed that the children lived in recreational vehicles, homeless shelters, and mobile homes, moving approximately five times before moving to the motel at the beginning of the case. Since the case began, the parents have been homeless and moved three other times. There has been no stability for the children. According to L.M., the parents have more financial stability because of their cleaning business. The business appears to be making some money. Both parents stated that the income was enough to support themselves and the children, although L.M. agreed that they may need help with food. Neither parent stated whether they could afford medical or dental care, both of which the children need.

The court found that the evidence was "overwhelming" that there has been no stability during the vast majority of the children's lives, having to move from place to place, hotel to hotel, and to recreational vehicle to trailer house. According to the court, the parents provided no stability "whatsoever" which was "incredibly" emotionally damaging to the children.

*Omissions and Excuses for those Omissions.* As noted above, the children's living environment at the beginning of the case was dangerous and unsanitary. Both parents admitted to abusing alcohol and marijuana, and to looking after the children while highly intoxicated. The parents provided no stability for the children and panhandled with them more than once. Neither parent excused their previous behavior and L.M. stated he was "dumbfounded" that he let himself put the children in these situations. He said that the lack of financial stability, A.W.'s mental health problems, and their admitted "volatile" relationship put them in the situation leading to this case. The court found the evidence clear that the parents' omissions were not a one-or-two-time occasion, but that these activities occurred throughout the children's lives.

The CASA volunteer and the conservatorship worker believed that it was in the children's best interest for L.M.'s parental rights to be terminated. The CASA volunteer stated that L.M. was unable to give the children a stable home devoid of drug use, violence, and emotional and physical neglect. The conservatorship worker did not believe that L.M. demonstrated the ability to provide for the children including stable housing and is still dealing with his and A.W.'s mental health

9

issues.  Moreover, the prior case and circumstances shows a pattern of behavior that is similar to the current case.

**Conclusion**

After viewing the evidence in the light most favorable to the finding and applying the statutory and ***Holley*** factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of L.M.'s parental rights was in the best interest of the children.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2); ***In re J.F.C.***, 96 S.W.3d at 266.  Although some evidence might weigh against the finding, such as L.M. being clean since the case began, financial stability from a cleaning business, and recent housing, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating L.M.'s parental rights is in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2); ***In re J.F.C.***, 96 S.W.3d at 266. Accordingly, we overrule L.M.'s sole issue regarding best interest.

## DISPOSITION

Having overruled L.M.'s sole issue, we ***affirm*** the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered July 24, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

10



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 24, 2019**

**NO. 12-19-00066-CV**

**IN THE INTEREST OF J.G.M.,
D.M., L.G.M. & L.E.M., CHILDREN**

Appeal from the 307th District Court
of Gregg County, Texas (Tr.Ct.No. 2017-1506-DR)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*